Strafford
No. 2008-675

THE STATE OF NEW HAMPSHIRE

v.

RALPH C. FLODIN

Argued: October 7, 2009
Opinion Issued: November 17, 2009

*Kelly A. Ayotte*, attorney general (*Thomas E. Bocian*, assistant attorney general, on the brief and orally), for the State.

*Getman, Stacey, Schulthess & Steere, P.A.*, of Bedford (*Andrew R. Schulman* on the brief and orally), for the defendant.

BRODERICK, C.J. The defendant, Ralph C. Flodin, was convicted in Superior Court (*Brown*, J.) of aggravated felonious sexual assault (AFSA) and sexual assault (SA). *See* RSA 632-A:2, I(g)(1) (Supp. 2008); RSA 632-A:4, I(a) (Supp. 2008). Because the evidence was insufficient to establish that the defendant provided therapy to the alleged victim within the meaning of RSA 632-A:1, VI (Supp. 2008), we reverse.

Viewing the evidence and all reasonable inferences in the light most favorable to the State, the jury could have found the following facts. *See State v. Dodds*, 159 N.H. 239, 246 (2009). The defendant was a part-time "spiritual services coordinator" at the Strafford County House of Correction (SCHC) at the time of the alleged incidents in this case. He graduated from high school in 1956 and subsequently worked in the heating oil business. In the early 1990s, he and his wife lived in an Amish community

in Pennsylvania for a year and a half, after which they returned to New Hampshire. The defendant pursued prison ministry by volunteering at SCHC and the New Hampshire State Prison. His volunteer work continued for more than ten years, during which he hosted and facilitated group and individual meetings with inmates, including conducting Bible studies, marriage seminars, and programs on forgiveness and anger management. Other than approximately six months of supplementary education immediately following high school, the defendant never received any formal education or undertook formal religious studies or training. He was not an ordained member of any clergy, nor was he licensed to engage in mental health practice pursuant to RSA chapter 330-A.

In July 2006, SCHC hired him to serve as a part-time spiritual services coordinator. His job responsibilities were similar to his tasks as a volunteer and included (1) coordinating and overseeing religious and spiritual activities within SCHC, (2) administering to the spiritual needs of the inmates and staff, and (3) conducting religious services and staff training. He was sometimes referred to as "chaplain" but he was neither ordained nor part of "lay clergy." The defendant regularly met with inmates to conduct what he described as "one-on-one counseling" and "spiritual counseling," with each session lasting on average ten minutes, and at times up to twenty-five minutes. His discussions with inmates concerned their life challenges and everyday struggles, their religious and spiritual issues, and their church background. The defendant testified that he "let [the inmates] do the leading of the questions," and he would "help them through the scriptures" and often pray with them.

He conducted group sessions and seminars on different topics, including scripture devotion, marriage, anger and forgiveness. The defendant distributed Bibles and study materials to the inmates, and later collected their study work for someone else to grade. He showed the inmates videotapes of religious "testimonials" to explain to them that when "they turn their lives over [to God] and realize that there was someone else that could control their thoughts and thinking through the scripture that they would be able to get through what they're going through." With respect to marriage seminars, the defendant facilitated meetings between husbands and wives, reminding them about the "boundaries" for physical touching and disseminating workbook materials for the couples to complete together. Finally, in connection with the anger and forgiveness programs, the defendant distributed booklets to the inmates and assigned homework to them. He explained that all of the programs he facilitated were based upon using scriptures as a tool to assist people with their problems. He testified, however, that he "wouldn't even know how" to treat inmates for disorders

or diagnose them, but that if "it was a behavioral issue, . . . [he] would tell them . . . you're just digging yourself a deeper hole."

Often, inmates initiated sessions with the defendant during his posted meeting hours, and at times, a corrections officer or staff member would ask him to meet with a particular inmate. SCHC staff did not, however, advise him of any inmate's psychological or medical diagnoses, and he did not receive training with respect to inmates with serious psychological problems. SCHC did not require the defendant to keep any records.

The alleged victim in this case was an inmate at SCHC. She met the defendant after a corrections officer saw her crying and asked if she wanted to talk to someone. At their first meeting together, the defendant discerned that she was "very frail-looking and shaken." He testified that he "told her, I got a feeling that you're hurting very deeply." She informed the defendant that she had been in a car accident that caused the death of a friend. In fact, charges arising from the accident led to her confinement at SCHC. At the conclusion of their initial meeting, they prayed together. According to the alleged victim, it made her "feel good" to talk with the defendant because he made her feel that he "really [did] care." She began meeting with him individually on a regular basis, usually weekly. In total, they met individually approximately twenty to twenty-five times.

The alleged victim had previously been diagnosed with a "schizo-affective disorder." She also had suffered delusions that included interactions with imaginary people. While she had exhibited troubled conduct and "act[ed] out" during her confinement at SCHC, the defendant had no knowledge of her history.

According to the alleged victim, their conversations involved religion about twenty-five percent of the time but they also discussed her feelings about the car accident, her family, and life in jail. Sometimes, they would hold hands and pray together. She informed the defendant that she had a bi-polar disorder and that "they [kept] changing" her diagnosis. She also told him that she felt suicidal. She testified that she had learned to "meditate [when] . . . studying witchcraft" and would do so when she felt "down and depressed." She explained to the defendant that she thought her meditation was "really healthy" for her, and he responded that it was a "good thing." SCHC medical staff asked the defendant several times to encourage the alleged victim to take her medication. He told her on different occasions that the medicine would help and not hurt her. He testified that he could tell when she had resumed taking her medication because her behavior improved.

The alleged victim testified that during the course of their meetings, they engaged in sexual conduct. She explained that while she had told the

defendant she was "okay" with the sexual touching, she did "not really" feel that way because she "felt like it wasn't right" and yet did not want to "be rude and tell him no."

After authorities learned of the purported sexual conduct in late April 2007, the police conducted two interviews with the defendant. He admitted that he and the alleged victim had engaged in sexual acts with one another, and acknowledged to authorities that what he did was "wrong." During his interview with the police, he described his role at the jail as "counseling" and "therapeutic in nature."

The defendant was indicted on multiple counts of AFSA and SA pursuant to the statutory variant that proscribes sexual penetration and sexual contact when the actor provides therapy to the victim (therapy variant). *See* RSA 632-A:2, I(g)(1); RSA 632-A:4, I. Before trial, the defendant filed a motion to dismiss the charges, arguing that he did not provide "therapy" within the meaning of the statute. *See* RSA 632-A:1, VI. Alternatively, he argued that the therapy variant was unconstitutionally vague. The Trial Court (*Houran*, J.) denied his motion, as well as his motion for reconsideration. At trial, following the State's case, the defendant moved unsuccessfully to dismiss the charges on the basis that the evidence was insufficient to support them. He testified on his own behalf and recanted the admissions he made to the police. At the close of the evidence, he renewed his motion to dismiss, which was denied. The jury convicted the defendant on two AFSA counts and two misdemeanor SA counts. This appeal followed.

The defendant argues that the evidence was insufficient to prove that he provided "therapy" to the alleged victim or that he acted "in a manner or for purposes which are not professionally recognized as ethical or acceptable." RSA 632-A:1, VI. He further argues that if the statute can be construed to reach his counseling meetings with the alleged victim, then the therapy variant under RSA 632-A:2, I(g) is unconstitutionally vague.

Our standard for review of the trial court's denial of a defendant's motion to dismiss based upon the sufficiency of the evidence is well established:

> To prevail upon his challenge to the sufficiency of the evidence, the defendant must prove that no rational trier of fact, viewing all of the evidence and all reasonable inferences from it in the light most favorable to the State, could have found guilt beyond a reasonable doubt. When the evidence is solely circumstantial, it must exclude all rational conclusions except guilt. Under this standard, however, we still consider the evidence in the light most favorable to the State and examine each evidentiary item in context, not in isolation.

*Dodds*, 159 N.H. at 246 (quotation omitted). This appeal involves the meaning of the therapy variant under RSA 632-A:2, I(g)(1).

> On questions of statutory interpretation, we are the final arbiter of the intent of the legislature as expressed in the words of a statute considered as a whole. Our task is to construe the Criminal Code provisions "according to the fair import of their terms and to promote justice" [as required by RSA 625:3 (2007)]. When a statute's language is plain and unambiguous, we need not look beyond it for further indication of legislative intent.

*State v. Foss*, 148 N.H. 209, 211 (2002) (citations omitted).

The therapy variant for AFSA under which the defendant was convicted provides:

> A person is guilty of the felony of aggravated felonious sexual assault if such person engages in sexual penetration with another person . . . [w]hen the actor provides *therapy*, medical treatment or examination of the victim and in the course of that therapeutic or treating relationship . . . [a]cts in a manner or for purposes which are not professionally recognized as ethical or acceptable.

RSA 632-A:2, I(g)(1) (emphasis added). The defendant's misdemeanor sexual assault convictions were based upon the same therapy variant, except that the *actus reus* was "sexual contact," rather than "sexual penetration." *See* RSA 632-A:4, I(a). Accordingly, to convict the defendant of AFSA and SA in this case, the State had the burden to establish the following: first, the defendant engaged in sexual penetration or sexual contact with the victim; second, he provided "therapy" to her; third, the charged sexual conduct occurred during the course of a therapeutic relationship; and finally, the defendant acted in a manner or for purposes that are not "professionally recognized as ethical or acceptable."

We turn first to the defendant's argument that the evidence was insufficient to establish that he provided therapy to the alleged victim. This is our first opportunity to examine the meaning of "therapy" as defined under the sexual assault statute.

The legislature defined "therapy" to mean "the treatment of bodily, mental, or behavioral disorders by remedial agents or methods." RSA 632-A:1, VI. We examine the common definition of some of the pivotal terms. *See State v. Kelley*, 153 N.H. 481, 483 (2006) (court consulted dictionary when considering the plain meaning of statutory terms). "Treatment" includes: "the action or manner of treating: as . . . conduct or behavior towards another party"; "subjection of something to the action of

an agent or process"; "the action or manner of dealing with something often in a specified way"; and "the techniques or actions customarily applied in a specified situation." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2435 (unabridged ed. 2002). Accordingly, this term connotes that the actor engaged in an intentional or planned action toward the subject or object of that action. Further, under the statute, the treatment must be directed towards "bodily, mental, or behavioral disorders." RSA 632-A:1, VI. The common meaning of "disorder" includes "a condition marked by lack of order, system, regularity, predictability, or dependability" and "a derangement of function: an abnormal physical or mental condition." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, *supra* at 652.

■ ■ The statute also requires that the treatment be "by remedial agents or methods." RSA 632-A:1, VI. The term "remedial" is commonly understood as "affording a remedy: intended for a remedy or for the removal or abatement of a disease or of an evil." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, *supra* at 1920. An "agent" is "something that produces or is capable of producing a certain effect: an active or efficient cause: a force effecting or facilitating a certain result." *Id.* at 40. Finally, a "method" encompasses "a procedure or process for attaining an object ... as ... a systematic procedure, technique, or set of rules employed in philosophical inquiry: a particular approach to problems of truth or knowledge." *Id.* at 1422. Considering the definitions together, we conclude that the legislature intended the term "therapy" to encompass activity whereby an actor implements a planned action for another person's "bodily, mental, or behavioral" disorder by affording him or her some systematic cause or measure, procedure, or technique or particular approach in order to cure, remove, counteract, relieve, or abate that disorder. For our purposes today, we need not consider the difference, if any, between the terms "agent" and "method."

Turning to the record before us, the State has identified certain treatment techniques or procedures that the defendant applied to the inmate population generally and to the alleged victim in particular: spiritual counseling, one-on-one and group counseling, anger management and forgiveness programs, marriage seminars, and discussion of both religious and nonreligious matters. It also points to evidence that the alleged victim told the defendant about her car accident, her thoughts of suicide, her bipolar diagnosis, feelings about her family, and incidents that occurred at the jail. Finally, it emphasizes that the defendant recognized her to be a "very confused and disturbed" person, who was "troubled" and "very depressed" and that she "fe[lt] good" after talking to him. In the end, the

State contends: "Were the defendant not trying to help [the alleged victim] remedy all (or even some) of [her] problems, there would have been no need for him to discuss them with her."

■ We conclude that the evidence in this case, as well as all reasonable inferences taken from it, viewed in the light most favorable to the State, does not support a rational conclusion that the defendant provided therapy to the alleged victim within the meaning of the statute. At most, the jury could have found that the defendant conducted regular meetings with the alleged victim during which time he asked her about her church and family background, and led or guided discussions about her emotional, family and daily life struggles. At times, he offered her spiritual or practical advice or guidance in order to ameliorate her struggles and perhaps to help her cope better behaviorally. On one occasion, he affirmed that it was a "good thing" that she was using meditation as a coping tool. Additionally, he testified that he generally told inmates that misbehavior resulted in "digging . . . a deeper hole." Further, at the request of SCHC, he encouraged the alleged victim to take her medication because it would help her, even though he lacked any information about her mental health or behavioral history. Occasionally, he ended their meetings with prayer time.

It appears that the defendant's conduct in affording the alleged victim an attentive and empathetic audience, and in encouraging her to freely talk about her personal difficulties and disclose sensitive information about herself, proved to be a valuable exercise for her. She testified that she "fe[lt] good" after their meetings, as if "there [were] some people out there [who] really [did] care." However, having regular meetings centered on different topics which ultimately generate encouraging and helpful discussions does not give rise to a rational conclusion that the defendant engaged in a planned action or a systematic cause or measure, procedure, technique or any particular approach in order to cure, remove, counteract, relieve, or abate the alleged victim's "bodily, mental, or behavioral disorders."

We reject the State's contention that the defendant's own characterization of his work as "counseling sessions" or therapeutic in nature somehow satisfies the statutorily defined dimensions of therapy. Moreover, the defendant's awareness of the alleged victim's bipolar diagnosis and thoughts of suicide, his characterization of her as confused, troubled and disturbed, and his encouragement for her to take prescribed medication does not transform their regular discussion time into treatment of a bodily, mental, or behavioral disorder through the use of remedial agents or methods.

■ The State charged the defendant under the single statutory variant for unlawful sexual contact and penetration within the confines of a therapy

relationship. Because the evidence does not support a rational conclusion that the defendant provided "treatment of [the alleged victim's] bodily, mental, or behavioral disorders by remedial agents or methods," however inappropriate the sexual conduct may have been, the charged sexual acts did not occur within the context of a "therapy" relationship. Accordingly, we reverse the convictions. Because we reverse the convictions based upon the statutory definition of "therapy," we need not address the defendant's alternative statutory argument or his constitutional claim. *See Petition of State of N.H.*, 152 N.H. 185, 191 (2005).

*Reversed.*

DALIANIS, DUGGAN and HICKS, JJ., concurred.